## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 25-cr-221 (TJK)** |
| **v.** | |
| **KAEVON SUTTON,** | |
| **Defendant.** | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

Mr. Sutton participated in the premeditated and brutal beating, robbery, and kidnapping of two drug dealers. He was not a reluctant member of this violent offense. Mr. Sutton, armed with a modified firearm, beat and kicked one of the men multiple times while his victim laid on the ground defenseless. Mr. Sutton then forced the man at gunpoint into his own car, violently shoving the man into the car, before kidnapping him. At the time he committed this offense, Mr. Sutton was pending sentencing in D.C. Superior Court. In that case, he shot and killed an unarmed man. Mr. Sutton received a fortunate jury verdict, with the jury only finding him guilty of a firearm offense. Despite that, in the few months he was pending sentencing, Mr. Sutton was a willing participant in a violent conspiracy. Following this offense, while on court-ordered supervision, Mr. Sutton committed a new armed offense. And even after being sentenced in that case, with the potential for revocation and re-incarceration, Mr. Sutton failed to comply with his release conditions. Mr. Sutton failed to report, failed to drug test, and then cut his own GPS monitor off. Mr. Sutton presents a danger to the community and will not comply with court-ordered supervision.

Given the presumption applicable to this case, and considering the factors set forth under 18 U.S.C. 3142(g), there are no conditions or combinations of conditions that will reasonably assure the safety of our community should Mr. Sutton be released.

## FACTUAL BACKGROUND

The charges in this case arise from the armed and premeditated ambush, beating, robbery, and kidnapping by Mr. Sutton of two men.

### *The May 2023 Ambush, Beating, Robbery, and Kidnapping of C1 and C2*

On May 20, 2023, at approximately 2:15 AM, the Metropolitan Police Department (MPD) responded to 4915 Quarles Street NE for a reported armed kidnapping. When MPD arrived, they found two men (C1 and C2) with visible injuries to their faces and heads.

  

*(Left, C1; Middle C-1; Right C-2)*

C-1 and C-2 reported that they had been hanging out in the alley when multiple men wearing masks and holding guns arrived in a black four-door sedan, jumped out of the vehicle, and began beating them with guns. The suspects ordered them to the ground where the men were searched. C-1 and C-2 were then forced into their own vehicles, before the suspects drove them into Maryland and forced them to strip and run into the woods. C-1 and C-2 eventually found assistance and were able to call 911.

During subsequent interviews, C-1 reported that he was sitting in his vehicle (a black 2010 GMC Yukon Denali) when several masked men approached his door. They shouted: "Where's the

money, where's the money?" The individuals removed him from his vehicle and struck him on the head multiple times with a firearm. They removed his jewelry before forcing him and C-2 into their respective vehicles. Three of the suspects, including one driver, got into C-1's Yukon with him. As they drove, they asked what he had in his house and C-1 told them everything he had was what they had already taken from him (i.e., his phone, jewelry, and marijuana). C-1 reported that that the men then left them in Maryland.

C-2 provided a consistent account. He stated that he was standing outside of C-1's Yukon at approximately 1:45 AM on May 20, 2023. C-2 admitted that he was in the alley that evening selling marijuana. Around that time, an older model black Infiniti with dark tint and white Virginia license plates pulled up next to C-1's Yukon. At least five young males jumped out of the car wearing masks and attacked C-1 and C-2. The suspects kept asking C-2: "Where's the money, where's the money?" C-2 directed them to a pouch in his car carrying money and marijuana, which the men stole. After striking them and going through their pockets, the suspects forced C-1 and C-2 back into their respective vehicles and drove their cars up Kenilworth Avenue toward the Burger Delite. They turned down the last residential street past the Truck Wash and then ordered C-1 and C-2 to take off their clothes so the suspects could see if they had anything left on them. They then ordered C-1 and C-2 to run into the woods. The suspects then drove away in C-1's and C-2's vehicles.

Neither C-1 nor C-2 reported recognizing any of the suspects.

### *Surveillance Video Corroborates C-1's and C-2's Report*

Law enforcement obtained surveillance footage from the Quarles Gardens Apartments, which corroborated C-1's and C-2's accounts.

As reflected on surveillance footage, at approximately 1:44 AM, C-1 was sitting in the

driver's seat of his Yukon looking at his phone and C-2 was standing outside of the Yukon when a black sedan bearing an unknown tag, entered the alley. The suspect vehicle drove down the alley, turned around at the end by the dumpsters, before circling back and parking next to C-1's C-1's Yukon facing Quarles Street NE. At least five unknown individuals then got out of the vehicle and approached C-1 and C-2. Each displayed a firearmd.

The footage reflected that the suspects approached C-1 and C-2, forced them to the ground, and one placed his right foot on C-1's head.

 

Another suspect then approached C-1 as he lay on the ground. The suspect was brandishing a

rifle-style firearm.



Another suspect, wearing a red hooded sweatshirt with white drawstrings, white sneakers, and a black mask, then exited the vehicle. This suspect pointed what appears to be a firearm at the back of C-2's head, as captured in the still shot on the right in Figure 3 below.

 

A fourth suspect is then seen on surveillance video wearing a black sweatshirt with three lines of white writing, a black mask, and ripped jeans, as captured in Figure 4 below. This suspect carried what appeared to be a firearm and struck C-2 with it while C-2 was on the ground.



A fifth suspect then is observed wearing a black sweatshirt with white zippers, a black mask, and a distinctive yellow glove over his left hand, as captured in the still shot on the left below.  He pointed what appeared to be a firearm at C-1, as captured below.

 

After exiting the vehicle, the suspects threw C-1 and C-2 to the ground behind the suspect vehicle and proceeded to strike them and search their persons. One of the suspects took C-2's car keys from his pocket and used the key fob to identify C-2's gray Nissan Murano. The suspect approached the vehicle, removed a gray bag from inside it, and slung it over his shoulder. Approximately one minute later, the suspect in the red hoodie and another suspect forced C-2 into the backseat of C-2's gray Murano at gunpoint. The suspect in the red hoodie does not appear to be wearing gloves. Shortly after, a different suspect forced C-1 into C-1's Yukon. The suspect vehicle then proceeded to flee the alley, followed by the Yukon and the Murano.

Law enforcement also recovered additional surveillance footage, reflecting some of the route the suspects took to drive into Maryland, as well as when the suspects circled back to head towards the initial crime scene.  This is consistent with the location where C-1's and C-2's vehicles were recovered, a few blocks from the alley on Olive Street NE.

*Identification of Kaevon Sutton as the Suspect in the Red Hoodie*

Crime scene technicians processed the crime scene and the victims' vehicles upon their recovery on May 20, 2023. Swabs of possible DNA were collected from multiple surfaces inside the vehicles, including the interior front passenger side door handle and buttons of C-2's Nissan Murano. These swabs were ultimately sent to the FBI's Quantico Laboratory for testing.

In March 2025, FBI was notified that a routine search of the FBI Combined DNA Index System (CODIS) indicated a possible DNA association between the swabs from the interior front passenger side door handle and buttons of the Nissan Murano Mr. Kaevon Sutton.  In response, the FBI provided the laboratory with DNA analysis related to Mr. Sutton for a prior D.C. Superior Court case. The initial comparison of the swabs from the interior passenger side door handle and buttons of the Nissan Murano to the DNA profile provided for Mr. Sutton reflected a likelihood ratio of 21 sextillion more likely if C-2, Sutton, and two unknown, unrelated people are contributors, than C-2 and three unrelated people.  This is considered "Very Strong Support" for inclusion by the FBI's laboratory and is the highest such indication.[1]

The FBI then learned that Sutton was arrested by the Prince George's County Police Department (PGPD) on December 21, 2023, approximately seven months after the kidnapping of C-1 and C-2.  Based on police reports, PGPD officers observed a carjacked vehicle in District Heights, Maryland. When the officers attempted a traffic stop, the driver fled, and a pursuit ensued. The pursuit ended when the car became disabled after colliding with other vehicles and a curb. The sole occupant, Mr. Sutton, fled on foot and was arrested a short distance away.  In the vehicle,

---

[1] The FBI Laboratory considers any likelihood ratio greater than one million as "Very Strong Support."  21 sextillion is a number so large it is difficult to fathom.  For example, to reach the figure 21 sextillion, you would need to multiple the population of the earth (8.2 billion) by 2.56 trillion.

law enforcement recovered a phone which did not belong to the vehicle owner or the victim of the carjacking. PGPD obtained a warrant for the phone and successfully extracted its contents. FBI subsequently obtained its own warrant for the extraction.

The extraction reflected that Mr. Sutton was the user of the device. Accounts in the device listed Mr. Sutton's full name. Additionally, the device contained photographs of Mr. Sutton's social security card, D.C. driver's license, and multiple selfie-style photos and videos. Further, the device was associated with a telephone number associated with Mr. Sutton.

Law enforcement separately obtained a tower dump warrant for towers servicing the offense location, the location where C-1 and C-2 were forced into the woods, and the location where C-1's and C-2's vehicles were abandoned. Mr. Sutton's device was located in the vicinity of all three locations during the offense.

### ***Digital Evidence Tying Sutton to the Offense***

In addition to the DNA and cellsite location evidence, Mr. Sutton's device contained additional evidence tying him to this offense. As reflected below, one of the suspects was wearing a red hoodie with white ties. Sutton's device contained an image of him dated the day before the offense in a similar hoodie.



The phone contained an additional image of Sutton dated after the robbery, with a stack of cash and what appears to be a tan firearm in his waistband.



Notably, surveillance video reflects that the suspect in the red hoodie was carrying what appears to be a tan firearm with some sort of rail-mounted light accessory.

  

Sutton's phone contains multiple images of what appears to be the same distinctive firearm.





All of these images are dated within two months of the offense.  Additionally, three days after

the offense, Sutton attempted to sell or exchange the same firearm in a series of text messages.



### *Mr. Sutton's Non-Compliance While on Supervision*

On December 30, 2024, Mr. Sutton was convicted of Unlawful Possession of a Firearm and Unauthorized Removal of a Motor Vehicle and sentenced to a partially suspended sentence. He was released to home confinement and placed on GPS monitoring. On March 23, 2024, the GPS device signaled a strap tamper alert. Mr. Sutton's supervising officer called Mr. Sutton the shortly after to ask about the tamper. Mr. Sutton repeated the phrase "it is what it is Bruh," several times and then hung up. Mr. Sutton has been on escape status since that time. Notably, during the same period, he was on supervision in Washington, D.C. for a firearm offense.

***Mr. Sutton's Arrest***

On August 5, 2025, a grand jury indicted Mr. Sutton on charges of Interference with Interstate Commerce by Robbery, in violation of 18 U.S.C. § 1951; Carjacking, in violation of 18 U.S.C. § 2119; and Brandishing a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

On August 7, 2025, law enforcement executed an arrest warrant for Mr. Sutton and a search warrant for the apartment in which he had been staying. Inside the apartment, law enforcement recovered a black backpack containing a plastic bag with approximately 20 apparently hand-pressed pills marked "M30." The pills field tested positive for fentanyl. Law enforcement also recovered approximately $600 in cash and a digital scale with visible residue. Additionally, law enforcement recovered the back plate for a Glock firearm. Notably this is the piece someone would remove to install an illegal machinegun conversion device. During a custodial interview, Mr. Sutton made a phone call to his girlfriend, in which he indicated that the pills belonged to him.

## ARGUMENT

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e). The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community. *See id.* The crimes triggering such rebuttable presumptions need not be expressly included in the charging instrument. *See United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (holding that "the complaint need not allege a violation of one of the particular predicate offenses for the presumption to come into play.") Instead, "[if] the facts establish probable cause

14

that the defendant has [committed such an offense], the judicial officer should give proper weight to Congress's general factual view that the defendant poses an unreasonable risk of danger to the community when applying the § 3142(g) factors." *Id.*

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

Because Mr. Sutton is charged with a violation of 18 U.S.C. § 924(c), the Court must presume that no condition or combination of conditions will reasonably assure the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(B). A review of the 3142(g) factors makes clear that no condition or combinations of conditions will assure the safety of the community if Mr. Sutton were to be released.

I.      **The Nature and Circumstances of these Offenses Merit Detention.**

Mr. Sutton is charged with serious crimes carrying significant penalties.  For Carjacking, Mr. Sutton faces a sentence of up to fifteen years' imprisonment. For Interfering with Commerce by Threat or Violence, Mr. Sutton faces a sentence of up to twenty years' imprisonment.  And for Brandishing a Firearm During a Crime of Violence, Mr. Sutton faces a mandatory minimum of seven years' imprisonment and a maximum of life.  These serious penalties are reflective of Mr. Sutton's violent and premediated conduct.

Mr. Sutton and others violently beat two men.  They threw them to the ground, rendering C-1 and C-2 helpless and defenseless immediately.  Despite that, the men beat C-1 and C-2 as the men feebly held their hands up to protect their faces.  Even after C-1 and C-2's possessions had been taken, the men continued to beat them.  Mr. Sutton was an active participant in the violence. Mr. Sutton struck C-2 and then kicked him multiple times as he lay on the ground. Mr. Sutton even appears to have taunted C-2 by strobing him with the laser-light attachment on his firearm. Mr. Sutton then violently pushed C-2 to his feet before escorting him to his own vehicle at gunpoint. There, Mr. Sutton shoved C-2 into the backseat of the vehicle.  Mr. Sutton never flinched as he beat a helpless C-2.

But this was not a crime of passion or opportunity: this was premediated.  Mr. Sutton knew that he was going to engage in this violence because he planned it. Mr. Sutton intentionally targeted two men who were dealing drugs. He and his co-conspirators armed themselves, covered their faces, and some even wore gloves. As reflected on surveillance video, the men drove into the alley, and turned around to better allow themselves to ambush C-1 and C-2 and then make their escape. Mr. Sutton and his co-conspirators then ambushed C-1 and C-2.  Despite his keen awareness of the violence he was going to inflict, Mr. Sutton never hesitated.  Instead, he appeared to relish it.

As this Court explained in *United States v. Lee*, "[t]he best outcome, if everything goes as planned during an armed robbery, involves a victim's being placed at risk and feeling terrified for his safety, possibly for years to come, and if things go wrong, someone—or multiple people—could be killed or seriously injured." 195 F.Supp.3d 120, 129 (D.D.C. 2016) (finding the nature and circumstances weighing heavily in favor of detention in a case where a single Hobb's Act robbery was charged). But Mr. Sutton's targets here were not shopkeepers or pharmacists: they were drug dealers. The danger associated with robbing a drug dealer is undeniably greater than that associated with robbing a store employee. There was a significant likelihood that Mr. Sutton's actions could lead to a shootout in that alley next to an apartment building. It is fortunate that C-1 and C-2 were the only victims of Mr. Sutton's violence.

Mr. Sutton's violent and premediated conduct weighs heavily in favor of detention.

## II.    <u>The Weight of the Evidence Against the Mr. Sutton is Formidable.</u>

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[2] The Government's case against Mr. Sutton is very strong. Mr. Sutton is tied to this offense by DNA, cellsite location data from a phone recovered from his person and then photographs of him in a similar outfit and wielding a similar and distinctive firearm

---

[2] While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

contemporaneous with the offense. With respect to the DNA, there is no logical or scientific reason for Mr. Sutton's DNA to be inside C-2's vehicle unless he was one of the men beating, robbing, and kidnapping C-2.  And the cellsite location data does not merely place Mr. Sutton at the location of the offense, it traces his kidnapping of C-2 from that location, north to Maryland where C-2 was forced into the woods, and then back south to where C-2's vehicle was abandoned. The digital evidence on Mr. Sutton's phone—photographs of him in a red hoodie and with the distinctive modified tan firearm—leave no doubt.

"[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10.  This is such a case, and Mr. Sutton should be detained pending trial

### III.    Mr. Sutton's History and Characteristics Merit Detention.

Just two months before this offense, in March 2023, Mr. Sutton stood trial for First Degree Murder While Armed in 2018 CF1 009709.

On March 19, 2018, Mr. Sutton approached a man named Aujee Tyler in the 3500 block of Stanton Road SE. Mr. Sutton was armed. Mr. Tyler was not. The two had a verbal disagreement which ended without violence. Mr. Sutton then walked away and entered an apartment building. A few minutes later, Mr. Sutton returned and walked back to Mr. Tyler.  Mr. Sutton pulled out a gun, pointed it at Mr. Tyler, and fired multiple times. Mr. Sutton continued firing even after Mr. Tyler fell to the ground. Mr. Sutton shot Mr. Tyler sixteen times, killing him.  Mr. Sutton then fled the jurisdiction to Ohio. The offense was captured on surveillance video. Mr. Tyler was not armed and never appeared to make a movement consistent with any violence.  Despite this, Mr. Sutton

testified and claimed he acted in self-defense. The jury acquitted Mr. Sutton of the lead charges but convicted him of Carrying a Pistol Without a License. Mr. Sutton was sentenced on August 9, 2023, meaning he was on release pending sentencing in that case when he planned and executed his attack on C-1 and C-2. Mr. Sutton received a fifty-nine-month suspended sentence in that case.

Despite this, Mr. Sutton failed to comply with the terms of his supervision. He failed to obtain employment, or drug test, and failed to report on numerous occasions. Additionally, just four months after he was sentenced, Mr. Sutton was arrested in Maryland and charged with an additional firearm offense as well as the theft of a vehicle. Once again, Mr. Sutton received the benefit of a partially suspended sentence. But once again, Mr. Sutton failed to comply with the terms of his supervision. Just three months after he was released to home confinement, Mr. Sutton cut off his GPS monitor. And Mr. Sutton was neither remorseful nor concerned with the potential repercussions. As Mr. Sutton repeatedly told his supervising officer, "it is what it is Bruh." Due to his conduct, at the time he was arrested for this offense, there were two warrants from two different jurisdictions for his arrest.

Mr. Sutton has committed incredibly violent acts in his past. He has received the benefit of leniency but consistently demonstrated his lack of regard for court supervision. Even while on escape status, he was still committing crimes given his possession of apparent fentanyl pills. Given his history, he will not comply. Indeed, because of the serious charges and mandatory minimum that he faces, he has every incentive not to comply.

Mr. Sutton's history and characteristics indicate that he should be detained pending trial.

**IV.    <u>Mr. Sutton Presents a Danger to Our Community.</u>**

The fourth and final factor, danger to any person or the community posed by Mr. Sutton's

release, similarly weighs in favor of detention.

Mr. Sutton participated in a brutal and premeditated beating of two men. He did so while pending sentencing after having been acquitted of murder. Many in that situation, having received the benefit of a favorable jury decision, would have avoided firearms, drugs, and violence. Not Mr. Sutton. Mr. Sutton planned and participated in a dangerous and violent robbery. He did so despite being aware, that if he was caught, he would face significant jail time, not just for his robbery of C-1 and C-2, but for his still pending firearm conviction. Indeed, his behavior here would have no doubt been significant to the D.C. Superior Court judge who was about to sentence him. None of this deterred Mr. Sutton. Nor has his court-ordered supervision since proved effective. He brazenly removed his GPS monitor and all but admitted it to his supervising officer.

There are no conditions or combination of conditions that can ensure the safety of our community should Mr. Sutton be released. He represents a danger to our community and should be detained pending trial.

## **CONCLUSION**

For these reasons, Mr. Sutton should be detained pending trial.

<div style="margin-left:40%">

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:        */s/ Cameron A. Tepfer*
Cameron A. Tepfer
N.Y. Attorney No. 5248208
Caelainn Carney
N.Y. Attorney No. 5751672
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530
202-258-3515
Cameron.Tepfer@usdoj.gov

</div>