UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br>     v.<br><br>KAEVON SUTTON<br><br>            Defendant. | Case No. 25CR221 |

**MOTION FOR SANCTIONS FOR FAILURE TO IDENTIFY *BRADY* EVIDENCE**

Kaevon Sutton respectfully moves this Court to sanction the government for failing to properly identify exculpatory *Brady* material in a timely manner in advance of trial. The delay in identifying the information at the beginning of this case, and to identify the material as exculpatory, violates the government's obligations under *Brady v. Maryland*, the Due Process Protections Act and Local Rule 5.1. The Defense seeks the appropriate relief to make Mr. Sutton whole prior to trial, specifically, orders by the Court to the government to assist the defense in its preparation and a curative instruction to the jury. In support of this Motion, Mr. Sutton states the following.

   I.     **Legal Standard**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have

1

ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "Because *Brady* obligates prosecutors to assure that all exculpatory material in the possession of its investigators is identified and disclosed, suppression by either a prosecutor or an investigator can violate *Brady*". See *In re Sealed Case No. 99-3096 (Brady Obligations),* 185 F.3d 887, 896 (D.C. Cir. 1999).

"'[T]he Government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials." *United States v. Saffarinia,* 424 F.Supp.3d 46, 85 (D.D.C. 2020); *see also United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (finding *Brady* violation here government failed to identify discrepancies about description in a misidentification case turned over in a Jencks production)." "[I]t should go without saying that the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it." *United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009). Similarly, the Second Circuit found: "The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be [potentially exculpatory]." *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987); *see also United States v. Blankenship,* 2015 U.S. Dist. LEXS 76287 at *16 (W.D.Va. 2015) ("The Court finds that the United States should specifically designate any known *Brady* material as such and disclose the same to defense counsel. In other words, without more, the United States does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery.").

II.     **Relevant Facts**

From the inception of this case and throughout the pretrial period, the government has represented a consistent set of facts as to the reporting of this incident to police. The prosecution has twice alleged that that the two complainants reported that they were robbed, carjacked and

kidnapped by five or six masked men with guns; that they were driven to Maryland, that they found assistance and called 911. Government's Memorandum in Support of Pretrial Detention, ECF No. 7 at 2-3; Government's Motion in Limine, ECF No. 27 at 2. ("C-1 and C-2 eventually found assistance and were able to call 911). But according to a 911 call that had never been identified as exculpatory, the two complainants *never called 911*. The 911 call was made by a third person, the wife of Unique Grimes who was the owner of the car but, as it turns out, was not on the scene.

SA Cahill's description of the 911 call in the application for arrest warrant, while technically accurate, is still misleading. She says: "C2 then called his wife who ultimately called the police to report the incident." Affidavit in Support of Warrant at 25. Omitting that Ms. Grimes' reported herself as the victim is concealment.

Ms. Tarnisha Grimes did not call on her husband's behalf. She lied and said she was carjacked herself. Ms. Grimes testified in the grand jury and is one the two civilian witnesses that the government anticipates calling at trial. She told the 911 operator the following:

1) That **she** was the one who was carjacked at 49th and Quarles Street;
2) That there were three men with guns
3) That she was at Quarles Street to check on her friend's mother and that's when she was carjacked;
4) That the three men were wearing all black;
5) That they drove off towards Eastern Avenue

Ms. Grimes' report was, of course, entirely false. But in its presentation to the grand jury, her 911 call wasn't even played. The Agent's testimony makes any mention of a 911 call and it was not played in Ms. Grimes' grand jury testimony. In response to a juror's question,

3

Agent Cahill testified: "I'm not sure of the first moment that they spoke to the police, if they spoke to them by phone or in person once they got back to the scene." Tr. 8/5/25, Cahill at 42. She later said: "Mr. Grimes eventually got in touch with his wife and he told me that he thought maybe one of the other folks out there had contacted his wife as well, when they thought he was in trouble, but – so his wife and son both came out to the scene to support him, to be with him and then they consented to giving their buccal swabs for their DNA to DFS." Tr. 8/5/25, Cahill at 21.

The grand jury heard no other mention of a 911 call. Ms. Grimes testified in the grand jury but not about the false 911 call. The government has not produced a 911 call from Mr. Grimes or Mr. Coleman. The bodyworn camera footage shows that they spoke to police when they returned to Quarles St with "Dina."

### III.    Argument

What is especially shocking is that the United States made representations, both before discovery began and after it was to have been completed, that Mr. Grimes and Coleman had called 911. This led the defense to believe that the one 911 call that was produced was another account by Mr. Grimes and Coleman. Though the government provided the 911 call six weeks before trial, the government was obligated to identify the exculpatory nature of the call. The government has a responsibility to correct assertions that it has made that wrong, even if it surrenders a litigation advantage. They have an additional burden to provide a defendant a fair trial. While it may be uncomfortable: "By requiring the prosecutor to assist the defense in making its case, the *Brady* rule represents a limited departure from a pure adversary model. The Court has recognized that the prosecutor's role transcends that of an adversary: he 'is the representative not of an ordinary party to a controversy, but of a sovereignty whose interest in a criminal prosecution is not that it shall win a case, but that justice shall be done." *United States v. Bagley*, 473 U.S. 667, 675 n.6

(1985). "Unless, indeed, the adversary system of prosecution is to descend to a gladiatorial level unmitigated by an prosecutorial obligation for the sake of truth, the government simply cannot avoid responsibility for knowing when the suppression of evidence has come to portend such an effect on a trial's outcome as to destroy confidence in its result." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995).

### A. The information is *Brady* material.

The government's case relies heavily upon the testimony of Unique Grimes and Tarnisha Grimes. They are expected to be the only civilian witnesses in the case. But it appears that the government's star witnesses initially colluded to provide a false story to the police where Ms. and not Mr. Grimes was the victim of a carjacking.

There is no question that this material is potentially exculpatory, and materially so in many forms. The information presents potential alternative defense theories that could have been investigated. It undermines the government's witnesses' credibility, as impeachment evidence and for the witness' propensity to tell the truth. Still and despite the government's prior representations to the contrary, the prosecution appeared to "hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it." *Skilling*, 554 F.3d at 577. There is no other explanation why it lacked any mention in either the testimony of the lead agent or Ms. Grimes herself or the careful navigation in the grand jury when the 911 call came up.

Where, like here, a witness' credibility is central to the case, the jury is entitled to know the evidence relevant to her credibility. *See Giglio v. United States*, 401 U.S. 150, 155 (1972). Impeachment evidence is important because "if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 676. In other words,

"the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence[.]" *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Even if Ms. Grimes was nowhere near the incident, her lie is relevant and potentially exculpatory information. And despite the government's misleading assertions that Mr. Coleman and Mr. Grimes "found assistance and were able to call 911" in pleadings as early as August 14th and as recently as October 1st, the government has never specifically told the defense that there was no 911 call. The defense only learned of this by listening to the 911 call itself and clarifying with the government that only one 911 call existed, which occurred on October 20th and 21st.[1]

B. **A significant sanction is appropriate**

The circumstances of this case require a significant sanction against the government. The government turned over this evidence without identifying it as *Brady* material, knowing that the defense would have to sift through a mountain of evidence in a short period of time and a trial date weeks away. The Court will recall that it was the government that requested the first available trial date at the initial status hearing, resulting in very little time for the defense to prepare. It was the government that did not provide a plea offer in this case. The defense has made extreme efforts to be ready for trial. But to date, the government has provided 491 GB of discovery in 4,894 files.



---

[1] The defense has no complaints about the responsiveness of the current prosecution team.

The government could not reasonably rely upon the defense to discover the import of the 911 call at a time sufficiently in advance of trial. Not when it is making assertions about a 911 call from the men, not Ms. Grimes. And the government knew that it was producing a half terabyte of discovery and should not have waited for the defense to get through to obviously helpful information with a trial date looming, six weeks from the September 5th date the 911 call was produced. It should have identified the information: "Beginning at the defendant's arraignment …to the defense as *soon as reasonably possible* after its existence is known, so as to enable the defense *to make effective use* of the disclosed information in preparation of its case." District of the District of Columbia Local Criminal Rule 5.1(a). Under these circumstances, that time was at the at least in August.

The government should have told both the grand jury and the defense of the call from the inception of this case at arraignment. Instead, the prosecution continued its misleading assertion. The government's 491 GB of discovery came in an avalanche of time – approximately 34 days – which also coincided with a surge of law enforcement cases brought to District Court.

The condensed timeframe is also caused by the government. The government requested the first available trial date because Mr. Sutton asserted his speedy trial rights for four days (even though counsel signaled potentially waiving time at the initial status). It is precisely this set of circumstances where the government was required to identify *Brady* material in a timely fashion so that the defense would have sufficient time to investigate in advance of trial. *See United States v. Hsia*, 24 F.Supp.2d 14, 29-30 (D.D.C. 1998) ("To the extent that the government knows of any documents or statements that constitute *Brady* material, it must identify that material to Ms. Hsia.").

The defense is significantly prejudiced by the government's failure to meet its *Brady* obligations. Meanwhile, Mr. Sutton is in pretrial detention and is no longer sure that his attorneys can be ready for trial. To make Mr. Sutton whole, the Court should: 1) require the government to make its witnesses available for a defense interview, without the government present; 2) provide the jury with a curative instruction; and 3) any other sanction that the Court sees fit.

IV.   **Conclusion**

The fairness of any trial depends on the government's respect and adherence to its disclosure obligations. Its failure to do so violates Mr. Sutton's Due Process rights. The defense therefore respectfully requests that the Court grant its motion.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Eugene Ohm
Elizabeth Mullin
Assistant Federal Public Defenders
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500